## TERRY et ux. v. MIDWEST REFINING CO.*
### No. 697.

Circuit Court of Appeals, Tenth Circuit.
March 31, 1933.

*Rehearing denied June 3, 1933.

C. R. Brice, of Roswell, N. M., and A. H. Darden, of Raton, N. M. (M. A. Sanchez, of Santa Fé, N. M., E. C. Crampton, of Raton, N. M., and Ellis Douthit, of Abilene, Tex., on the brief), for appellants.

J. O. Seth, of Santa Fé, N. M. (R. J. Fellingham, of Chicago, Ill., A. C. Campbell, of Cheyenne, Wyo., and A. K. Barnes, of Denver, Colo., on the brief), for appellee.

Before LEWIS and McDERMOTT, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge.

This action was instituted in the court below by appellants, husband and wife, for the alleged purpose of recovering possession of 80 acres of land in Lea County, New Mexico. They claim under patent from that state, and alleged that they are owners of the 80 acres in fee simple, and asked—

"that they have judgment for the possession of said premises, and ejecting the defendant therefrom, for the sum of $1,015,000.00 damages, that the plaintiffs be adjudged the owners of such premises in fee simple, and that defendant be adjudged to have no right, title or interest therein, and for such other and further relief as they may be entitled to in the premises."

In their reply to the defendant's answer— "plaintiffs state that this is an action in ejectment only, as provided by the statutes of the State of New Mexico, and that they are seeking the relief against the defendant as authorized by the law of ejectment, and for no other purpose, and ask no other relief except as provided and authorized in an action of ejectment."

The parties waived a jury. The judge heard the proof and made findings of fact and conclusions of law, among others:

"This is an action (of) ejectment, and in such a proceeding the plaintiffs must stand on the legal title—that is, the patent referred to in the foregoing findings of fact."

Appellants' brief opens with, "This is an action in ejectment * * * for the possession of eighty acres of land. * * *" A copy of the patent issued by the state of New Mexico on September 9, 1930, to Will Terry, one of the appellants, conveying to him the land in question was attached to the complaint and made a part of it by reference. Following the granting clause is this reservation:

"And reserving also to the State of New Mexico all minerals of whatsoever kind, including oil and gas, in the lands so granted, and to it, or persons authorized by it, the right to prospect for, mine, produce and remove the same, and perform any and all acts necessary in connection therewith, upon com-

pliance with the conditions and subject to the limitations of the laws of the State of New Mexico, such tract of land so conveyed being a portion of the lands granted to the State of New Mexico by the United States, pursuant to the Act of Congress approved June 21, 1898, and June 20, 1910."

There is also a copy of an oil and gas lease given by the state of New Mexico to appellee of date October 18, 1928, attached to the complaint and by reference made a part of it. It conclusively appears from appellee's answer and the proof in support thereof that the only claim it makes and has is under that lease, that it has put down two oil wells on said 80 acres and has produced large quantities of oil and gas therefrom, and that it has used and is using only a sufficient amount of the surface for that purpose. Under said lease appellee has bound itself and is obligated to pay the royalties therein reserved to the state of New Mexico. In no other respect has it interfered or is it interfering with appellants' rights in and to said 80 acres. Hence it appears appellants did not and do not own the fee and cannot maintain in the federal courts an action of ejectment ousting the appellee. Carter v. Ruddy, 166 U. S. 493, 17 S. Ct. 640, 41 L. Ed. 1090; Fenn v. Holme, 21 How. 481, 16 L. Ed. 198; Sanford v. Sanford, 139 U. S. 642, 11 S. Ct. 666, 35 L. Ed. 290; McGrew v. Byrd (C. C. A.) 257 F. 66; Ewert v. Robinson (C. C. A.) 289 F. 740. In St. Louis Smelting & Refining Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875, the action was ejectment for land patented to another. At page 647 of 104 U. S., the court said:

"If in issuing a patent its officers [of the United States] took mistaken views of the law, or drew erroneous conclusions from the evidence, or acted from imperfect views of their duty, or even from corrupt motives, a court of law can afford no remedy to a party alleging that he is thereby aggrieved."

Treating the action as one in ejectment, it seems clear that the order of dismissal should be affirmed.

■ But we hesitate to so restrict the pleadings. They embody allegations on the part of appellants that present claimed equitable rights to the minerals. The complaint and the exhibits attached thereto which by reference are made a part of the complaint cover forty-five pages of the record. The answer and the exhibits attached to it cover twenty-five pages of the record, and the appellants' reply thereto twenty-six pages. The complaint may with more reason be taken as a

bill in equity to quiet appellants' claimed title to the minerals. We, of course, realize that estimate of the complaint puts appellants out of court because of the absence of New Mexico, an indispensable party, as we held in the like case of Skeen v. Lynch, 48 F.(2d) 1044. But we proceed to a consideration of the merits of the real issue and controversy. Do appellants own the minerals under this eighty acres, or do they belong to the state of New Mexico?

Prior to statehood, January 6, 1912, the eighty acres was a part of the public domain. By section 7 of the Enabling Act (36 Stat. 557, 562) Congress donated to the state in trust 100,000 acres for schools and asylums for the deaf, dumb and blind, and this tract was a part thereof. Parts of section 10 of said act (36 Stat. 563) are material to this inquiry, and are as follows:

"That it is hereby declared that all lands hereby granted, including those which, having been heretofore granted to the said Territory, are hereby expressly transferred and confirmed to the said State, shall be by the said State held in trust, to be disposed of in whole or in part only in manner as herein provided and for the several objects specified in the respective granting and confirmatory provisions, and that the natural products and money proceeds of any of said lands shall be subject to the same trusts as the lands producing the same.

"Disposition of any of said lands, or of any money or thing of value directly or indirectly derived therefrom, for any object other than that for which such particular lands, or the lands from which such money or thing of value shall have been derived, were granted or confirmed, or in any manner contrary to the provisions of this Act, shall be deemed a breach of trust.

"No mortgage or other incumbrance of the said lands, or any thereof, shall be valid in favor of any person or for any purpose or under any circumstances whatsoever. Said lands shall not be sold or leased, in whole or in part, except to the highest and best bidder at a public auction to be held at the county seat of a county wherein the lands to be affected, or the major portion thereof, shall lie, notice of which public auction shall first have been duly given by advertisement, which shall set forth the nature, time, and place of the transaction to be had, with a full description of the lands to be offered, and be published once each week for not less than ten successive weeks in a newspaper of general circulation published regularly at the state

capital, and in that newspaper of like circulation which shall then be regularly published nearest to the location of such lands so offered; nor shall any sale or contract for the sale of any timber or other natural product of such lands be made, save at the place, in the manner, and after the notice by publication thus provided for sales and leases of the lands themselves: Provided, That nothing herein contained shall prevent said proposed State from leasing any of said lands referred to in this section for a term of five years or less without said advertisement herein required.

"All lands, leaseholds, timber, and other products of land before being offered shall be appraised at their true value, and no sale or other disposal thereof shall be made for a consideration less than the value so ascertained, nor in any case less than the minimum price hereinafter fixed, nor upon credit unless accompanied by ample security, and the legal title shall not be deemed to have passed until the consideration shall have been paid. * * *

"Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this Act shall be null and void, any provision of the constitution or laws of the said State to the contrary notwithstanding.

"It shall be the duty of the Attorney-General of the United States to prosecute in the name of the United States and its courts such proceedings at law or in equity as may from time to time be necessary and appropriate to enforce the provisions hereof relative to the application and disposition of the said lands and the products thereof and the funds derived therefrom.

"Nothing herein contained shall be taken as in limitation of the power of the State or of any citizen thereof to enforce the provisions of this Act."

The New Mexico Constitution provides that one of the executive officers of the state shall be the commissioner of public lands. Article 5, § 1. Article 13 of said Constitution deals with public lands, and section 2 thereof provides:

"The commissioner of public lands shall select, locate, classify, and have the direction, control, care and disposition of all public lands, under the provisions of the acts of congress relating thereto and such regulations as may be provided by law."

Section 9 of article 21 accepted the grants set forth in the Enabling Act on the terms therein stated, and article 24 provided for the leasing of said lands for the development and production of any and all minerals therein, reserving a royalty to the state, the rentals, royalties and other proceeds therefrom to be conserved and applied in accordance with said Enabling Act.

A sale or lease of the state's public lands is initiated by an application of the would-be purchaser. Its form and contents are prescribed by the commissioner of public lands. When such application or applications are received by the commissioner for purchase of these lands he fixes the time and place where public sale of lands applied for will be made after they have been advertised as provided in said Enabling Act. This seems to have been the uniform practice since statehood.

Will N. Terry, appellant, a resident and citizen of the state of Texas, made application in 1917 to purchase 4,040 acres, and agreed to bid and pay therefor as much as $5.00 per acre, a small amount down and the balance in installments with interest at four per cent per annum on deferred payments, if he should be the successful bidder. These are excerpts from his application:

"I further agree that should I be the successful bidder at such public auction, and the land applied for herein awarded to me, I will, within thirty days after notice to me by the Commissioner of Public Lands, enter into a contract by properly executing the same for the purchase of said land and the payment of the balance of the purchase price, payable as herein set forth. * * *

"If there is any coal, mineral, oil or gas on the land, state fully just what, and extent of same, and on what 40-acre tracts? None. * * *

"If your application is passed on favorably and contract is issued to you, to what use do you intend to put the land applied for? Grazing. * * *

"I further state that the land applied for herein is essentially non-mineral land, and that this application is not made for the purpose of obtaining title to mineral, coal, oil or gas lands fraudulently but with the sole object of obtaining title to the land applied for for grazing and agricultural purposes."

Attached to said application was a statement entitled "Instructions to Applicants." At the top it had this line, "Read these Instructions Carefully Before Making Appli-

cation." It set forth the minimum prices for lands in different parts of the state as required under the terms of the Enabling Act, and contained these statements:

"The commissioner has the right to reject any application made for reasons considered by him to be good and sufficient.

"Lands containing minerals cannot be sold at all. Lands known as timber lands or timber on state lands apart and separate from the land can be sold, but only for cash and not on the deferred payment plan. * * *

"Upon approval of an application, and after advertisement and auction, a contract will be made by the State Land Office and sent to the successful bidder for execution. If not signed within 30 days after receipt, first payment made by such applicant become forfeited to the State."

The lands applied for were appraised and advertised for sale. The notice stated that "pursuant to the provisions of an Act of Congress approved June 20, 1910, the laws of the state of New Mexico, and the rules and regulations of the state land office, the commissioner of public lands will offer at public sale to the highest bidder at 9:00 o'clock A. M. on Wednesday, January 16, 1918. * * *" Lands to be offered for sale were described. The notice stated that no bid would be accepted for less than $5.00 per acre. There was to be a down payment, and the remainder of the bid was to be paid over a period of thirty years with four per cent interest on all deferred payments. The notice also contained this:

"The above sale of land will be subject to valid existing rights, easements, rights of way, and reservations.

"The commissioner of Public Lands or his agent holding such sale reserves the right to reject any and all bids offered at said sale."

Terry seems to have been the highest bidder for 1,720 acres. Thereafter he and the commissioner executed a written contract in February, 1918, but representing it to have been made on January 16, 1918, by which the commissioner agreed to sell and convey to Terry by good and sufficient title the 1,720 acres, and Terry agreed to pay the remainder of the purchase price with interest on deferred payments. The contract contained this:

"This land is being purchased for the purpose of grazing and agriculture only; that while the land herein contracted for is believed to be essentially non-mineral land, should mineral be discovered therein it is expressly understood and agreed that this contract is based upon the express condition that the minerals therein shall be and are reserved to the fund or institution to which the land belongs, together with right of way to the Commissioner, or any one acting under his authority, to at any and all times enter upon said land and mine and remove the minerals therefrom without let or hindrance."

Later Terry desired to be released from purchasing 240 acres described in his contract. He was at that time in default on his payments. The commissioner consented, and on August 8, 1927, he and Terry entered into a new contract leaving out the 240 acres, but otherwise following the same form as the original contract and containing the identical language quoted supra from the first contract. Later Terry desired to eliminate from his second contract 40 acres. The commissioner agreed, and on June 9, 1930, he entered into a third contract with the commissioner substantially like the other two contracts excepting the elimination of the 40 acres, and containing again the excerpt quoted above with reference to the reservation by the state of minerals.

Finally of date September 9, 1930, Terry made full payment of the remainder of the purchase price on 1,440 acres described in his third contract, and the commissioner of that date delivered to him the state's patent therefor containing the reservation to the state of the minerals in the lands so granted, quoted in the forepart of this opinion. Terry protested the inclusion of that reservation in the patent, and demanded a patent with it eliminated, but the commissioner refused. He protested the reservation in the third contract. Prospecting for oil and gas was then going on in the neighborhood of the 80 acres, and had been for some time theretofore. It was then generally believed that the lands were of great value for their oil and gas. In fact, appellants admit that the state of New Mexico gave an oil lease on the 80 acres in controversy in January, 1925. When the third contract was entered into on June 9, 1930, the appellee had put down two wells on the 80 acres, each to a depth of more than 4,000 feet and at a total cost of more than $130,000, and oil and gas was being produced in large quantities.

The District Judge found as a fact that appellants at all times had full knowledge of the reservation of minerals contained in the contracts and patent, but the plaintiffs, except by their demand on the commissioner of July 26, 1930, for the issuance of a patent

without mineral reservations and by the institution of this proceeding on September 22, 1930, had made no objection whatever to the inclusion of said mineral reservation in said contract and patent and had taken no steps whatever to assert the claimed invalidity of said reservations; that numerous other companies and individuals drilled a large number of wells for oil and gas in the general vicinity of the eighty acres in 1927, and that about October 12, 1927, appellee herein drilled a well on land immediately adjacent to the 80 acres, and in June, 1928, discovered oil therein in paying quantities; that in December, 1929, it completed a well on the 80 acres, and in June, 1930, another well on that 80, both of which are producing.

The record shows that the state has issued patents conveying to purchasers a little more than 59,000 acres of public lands without mineral reservations therein, but it does not appear on what terms any of those sales were made, whether there were contracts containing the reservation. It may be inferred those sales were made by the territory, and the state's patents were in accord with the terms of sale. It seems to have been and is now the uniform practice to extend payments of the purchase price over many years. But it appears that the territory prior to August, 1909, adopted a form of contract to be used in the making of such sales wherein the minerals were expressly reserved to the fund or institution to which the lands belonged in substantially the same terms as the reservations in Terry's three contracts. There had been land grants to the territory. The state, however, in its first form of contract added this clause immediately preceding the reservation clause: "That this land is being purchased for the purpose of grazing and agriculture only." Since the state was admitted it has required that purchasers' contracts and state patents reserve all minerals to the state. In that way a vast acreage has been sold, and some in the same way in territorial days, for which state patents issued containing the reservation.

This sale involved more than 170,000 acres, and was conducted by an employé in the commissioner's office who announced that all sales were made subject to the final approval of the commissioner. The first action taken by the commissioner thereafter was to send by mail to Terry the contract bearing date of January 16, 1918, which Terry executed on February 11, 1918, and returned by mail to the commissioner, who thereupon executed it. The reservation therein is quoted supra.

Counsel for appellants tell us in their brief the record raises two principal issues: "First, Should the mineral reservation in the patent be declared void in an action of ejectment? and second, Should plaintiffs be estopped from claiming title to the minerals if such reservation is void?" They seek to establish the affirmative of the first proposition on the claim that the commissioner of public lands was without power, both under the Enabling Act and under the state Constitution and statutes, to make the reservation in the patent and contracts; and having sustained, as they claim, the absence of such power that conclusion will serve two purposes. First. The action of ejectment is maintainable, for which they cited Waskey v. Hammer, 223 U. S. 85, 32 S. Ct. 187, 56 L. Ed. 359. Second. The reservation will be obliterated from the contracts and patent, leaving conveyance of fee title to Terry. As to the Enabling Act (section 10)—they rely on the paragraph reading thus:

"Every sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof, not made in substantial conformity with the provisions of this Act shall be null and void, any provision of the constitution or laws of the said State to the contrary notwithstanding."

It is not claimed that the published notice of sale was not given as required by the Enabling Act. A contention of that sort, if maintained, would destroy any title in appellants. They do argue that the legal effect of the notice of sale was that fee title was to be sold, that appellant, Will N. Terry, bid for land as it was advertised, and that, therefore, the commissioner had no power to insert a reservation of the minerals in the contracts and patent. But plainly on the facts stated Terry was not buying the minerals, if any, on the 80 acres. Anyone intending to make such purchases, unless wilfully blind and deaf, would have learned from the long custom and practice that these reservations were to be made. Furthermore, the statement he made in his application, that he was applying for the lands with the sole object of obtaining title for grazing and agricultural purposes, would have aroused an inquiry from any intelligent man as to why he was asked about the use he intended to make of the land, if he had thought for a moment that he was bidding for a fee title. As confirmatory of his knowledge that he was not buying any right to minerals and that they were reserved to the state is the fact that he executed a con-

tract within thirty days after his bid containing the reservation, and nine years later a second contract containing that reservation, without objection or protest. Moreover, section 10 of the Enabling Act impliedly, if not expressly, authorizes the disposition of natural products of the land separate and apart from the land itself, and certainly there is no prohibition in said section of that being done by the state. There are several expressions in the section supporting implication that it was intended there might be a separation of surface rights from rights to the minerals, and so separated sold separately. The first paragraph of the section speaks of disposing of the lands "in whole or in part." The third paragraph speaks of the sale of any timber or other natural products of such land, also the leasing of any of said lands; and the fifth paragraph, last quoted supra, the "sale, lease, conveyance, or contract of or concerning any of the lands hereby granted or confirmed, or the use thereof or the natural products thereof." The manifest and predominating purpose of Congress was that the lands were to be disposed of in a manner that would bring the greatest returns to the beneficiary of the grant. That, of course, is always the duty of a trustee. The state took the lands in trust to that end. The act contemplated the exercise of some discretion by the trustee in disposing of the land and their natural products, so that from their proceeds schools and asylums could be established and maintained. Of course, the state could act only through officers or agents. After full consideration of said section 10, we are unable to say that the state commissioner violated any requirement of the section, nor did he exercise any power therein denied him. In our opinion he made the sale in substantial conformity with the provisions and purposes of the Enabling Act. The reservation of the mineral was not prohibited by the Enabling Act, it was a wise, just and lawful act on the part of the trustee's agent administering the trust, and neither void nor voidable as being in contravention of the terms or purposes of that act.

Appellants urge Burke v. Southern Pac. R. R. Co., 234 U. S. 669, 34 S. Ct. 907, 913, 58 L. Ed. 1527, in support of their contention. We think it has no application. Congress excepted from the grant there made, as did the patent, to the railroad company "all mineral lands." As pointed out at the bottom of page 683 of the opinion in 234 U. S., 34 S. Ct. 907, 913, that "was not a mere reservation of minerals, but an exclusion of mineral lands. * * *" We do not doubt that, if the railroad act had reserved to the United States any and all mineral that might thereafter be found in the lands granted, the reservation would have been sustained.

Counsel for appellants further contend, if we understand them correctly, that inasmuch as the commissioner of public lands was a state officer his powers must be found in its constitution and legislative acts, and that he had no authority to put the reservation clause in the patent or contracts. But full and complete answer has been made, we think, to this contention by the Supreme Court of the state of New Mexico. State ex rel. Otto v. Field, 31 N. M. 120, 241 P. 1027. In that case the court reviewed the powers vested in the commissioner by the state Constitution and statutes over the disposition of its public lands and held that the purchaser who made his purchase in April, 1917, and entered into a contract containing a reservation identical with the reservation in the contract with Terry, was not thereafter on payment of the full consideration entitled to patent without the reservation. We are bound by that court's interpretation of the New Mexico Constitution and statutes. Later that court in referring to its decision in State ex rel. Otto v. Field, supra, said in American Mtg. Co. v. White, 34 N. M. 602, 287 P. 702, 703: "The power of the commissioner is very broad, and he is a sort of business manager of the lands under his control." Again that court said in Davidson v. Enfield, 35 N. M. 588, 3 P. (2d) 979, 981:

"The statute should be viewed in the light of the very broad powers conferred on the commissioner in the administration of the public lands of this state. It has been held that his jurisdiction over state lands under the applicable constitutional and statutory provisions, vests him with practically absolute dominion over such lands. State ex rel. Otto v. Field, 31 N. M. 120, 153, 241 P. 1027."

We conclude that appellants' case on the facts is without merit.

Affirmed.