**UNITED STATES of America, Appellant,**

v.

**UNION PACIFIC RAILROAD COMPANY, Appellee.**

**No. 5168.**

United States Court of Appeals Tenth Circuit.

Feb. 24, 1956.

Frederick W. Smith, Washington, D. C. (Perry W. Morton, Asst. Atty. Gen., John F. Raper, Jr., U. S. Atty., Cheyenne, Wyo., and Roger P. Marquis, Washington, D. C., were with him on the brief), for appellant.

William W. Clary, Los Angeles, Cal. (Loomis, Lazear & Wilson, John U. Loomis, Cheyenne, Wyo., O'Melveny & Myers, Louis W. Myers, Warren M. Christopher and Charles H. McCrea, Los Angeles, Cal., were with him on the brief; Frank E. Barnett, New York City, W. R. Rouse, J. H. Anderson, Omaha, Neb., and Henry M. Isaacs, Los Angeles, Cal., of counsel), for appellee.

Before HUXMAN, MURRAH, and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The United States brought this action for a determination of its right to oil and gas, or other minerals, underlying a portion of the Union Pacific right of way in Wyoming, and to restrain the Union Pacific Railroad Company from removing oil and gas from such lands. The single question presented is whether the right of way grant in Section 2 of the Act of July 1, 1862, 12 Stat. 489, 491, conveyed to the predecessor of the Union Pacific such title as to entitle it to develop and take the underlying minerals therefrom.[1] On stipulated facts, the trial court found that the Act granted a fee simple determinable, sometimes called a base, qualified or limited fee title in the right of way, subject only to an implied condition of reverter in the event the company ceased to use the right of way for the purpose of the Act, which title carried with it the right to remove the subsurface oil and gas, and other minerals. 126 F. Supp. 646. A judgment was entered dismissing the action.

The aforementioned Section 2 of the Act of July 1, 1862, reads as follows:

"Sec. 2. *And be it further enacted,* That the right of way through the public lands be, and the same is hereby, granted to said company for the construction of said railroad and telegraph line; and the right, power, and authority is hereby given to said company to take from the public lands adjacent

---

[1] A stipulation of the parties states their claims as follows:

"6. Defendant claims that under the Acts of Congress set forth in Paragraph 3 hereof, it received a present grant in fee simple determinable (sometimes called a base, qualified or limited fee) of the lands contained within the right of way and acquired the sole and unrestricted right to drill for, remove, use and dispose of the subsurface oil, gas, and other minerals underlying the right of way. Plaintiff claims that the defendant acquired the right to use the right of way only for railroad and telegraph purposes, that defendant acquired no right to use any portion of the right of way to drill for or remove subsurface oil and minerals, that the oil, gas, and mineral deposits underlying the right of way remain the property of the United States and subject to its control and disposition, and that plaintiff is entitled to the relief prayed for. The purpose of this case is to adjudicate those claims and determine the relative rights of the United States and the defendant in the oil, gas, and other minerals underlying the right of way."

to the line of said road, earth, stone, timber, and other materials for the construction thereof; said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, and depots, machine shops, switches, side tracks, turntables, and water stations. The United States shall extinguish as rapidly as may be the Indian titles· to all lands falling under the operation of this Act and required for the said right of way and grants hereinafter made."

Section 3 grants to the predecessor of the Union Pacific alternate sections over a limited area along the right of way. It provides that "all mineral lands shall be excepted from the operation of this Act". Section 4 fixes the time when patents shall issue for the alternate sections. It is stipulated that the Act has been complied with and it is not contended that the drilling for oil and gas on the right of way will interfere with the operations of the railroad or the use of the right of way for railroad purposes.

█ The question of the extent of the estate conveyed in the right of way grants under this Act, and similar Acts during the same period, has been before the courts on numerous occasions. As to those grants, it has been held without exception that the railroad received more than a mere easement over the land. The substance of the decisions is that considering the time and the circumstances under which these grants were made, Congress intended to convey a limited fee with an implied condition of reverter to the United States in the event the company ceased to use or retain the land for the purposes for which it was granted. The most important of these are St. Joseph & Denver City Railroad Co. v. Baldwin, 103 U.S. 426, 26 L.Ed. 578; Missouri, Kansas & Texas Ry. Co. v. Roberts, 152 U.S. 114, 14 S.Ct. 496, 38 L.Ed. 377; Territory of New Mexico v. United States Trust Co., 172 U.S. 171, 19 S.Ct. 128, 43 L.Ed. 407; Northern Pacific Ry. Co. v. Townsend, 190 U.S. 267, 23 S.Ct. 671, 47 L.Ed. 1044; Clairmont v. United States, 225 U.S. 551, 32 S.Ct. 787, 56 L.Ed. 1201; Union Pacific R. R. Co. v. Laramie Stock Yards Co., 231 U.S. 190, 34 S.Ct. 101, 58 L.Ed. 179; Missouri, Kansas & Texas Ry. Co. v. Oklahoma, 271 U.S. 303, 46 S.Ct. 517, 70 L.Ed. 957. These cases illustrate that the Supreme Court had a clear understanding of the accepted meaning of the terms "easement", "right of way", "limited fee", and "fee title". The grants considered in the foregoing cases were all made during the period 1850 to 1871. During this period it was considered of utmost national importance that a railroad be constructed to the west coast of the United States and to other areas of the west and northwest. Indeed, the Supreme Court, in referring to the Union Pacific grant, said in United States v. Union Pacific R. R. Co., 91 U.S. 72, 79, 23 L.Ed. 224, that "many of the provisions in the original Act of 1862 are outside of the usual course of legislative action concerning grants to railroads, and cannot be properly construed without reference to the circumstances which existed when it was passed." [2]

2. These circumstances, the court described in part as follows:
"The war of the rebellion was in progress; and, owing to complications with England, the country had become alarmed for the safety of our Pacific possessions. * * * It is true, the threatened danger was happily averted; but wisdom pointed out the necessity of making suitable provisions for the future. This could be done in no better way than by the construction of a railroad across the continent. * * *
"Although this road was a military necessity, there were other reasons active at the time in producing an opinion for

At the time Congress did not consider these grants as bounties or gratuities bestowed upon the railroads but a means of inducing capital to construct railroads, under the most hazardous conditions, for the benefit of the nation. The grants were in the nature of proposals which the company could accept or reject. Nadeau v. Union Pacific R. R. Co., 253 U.S. 442, 40 S.Ct. 570, 64 L.Ed. 1002; Burke v. Southern Pacific R. R. Co., 234 U.S. 669, 679, 34 S.Ct. 907, 58 L.Ed. 1527. The inclusion of the right of way grant was an important part of the proposal and the inducement. St. Joseph & Denver City Railroad v. Baldwin, supra.

To accomplish this national need, Congress adopted a policy of granting a right of way to railroads, and in addition the fee title to large areas of non-mineral lands lying on either side of a right of way. This policy came to an end in 1871.

It is urged that the cases hereinabove cited are not authority here because the United States was not a party and the right to minerals underlying rights of way was not being considered. This is true, but in the Great Northern Ry. Co. v. United States case, 315 U.S. 262, 62 S.Ct. 529, 534, 86 L.Ed. 836, the United States was a party and the precise question under consideration was the right to the minerals underlying the right of way of Great Northern. The rights in that case were acquired under the general Right of Way Statute. Act of March 3, 1875, 18 Stat. 482, 43 U.S.C.A. § 934. The court carefully analyzed the "limited fee" cases and the Acts from which they arose, and held that under the 1875 Act, the railroad had only an easement in the right of way grant and was not entitled to the underlying minerals. This result was reached not by overruling, or even criticizing the former cases, but by distinguishing the grants [3] and concluding that the 1875 Act was "a product of the sharp change in Congressional policy with respect to railroad grants after 1871 * * *." The court stated that the former cases construed land grant acts before the shift in congressional policy occurred in 1871, therefore were "not controlling here." The court observed that "When Congress made outright grants to a railroad of alternate sections of public lands along the right of way, there is little reason to suppose that it intended to give only an easement in the right of way granted in the same act." It is

---

its completion besides the protection of an exposed frontier. There was a vast unpeopled territory lying between the Missouri and Sacramento Rivers which was practically worthless without the facilities afforded by a railroad for the transportation of persons and property. With its construction, the agricultural and mineral resources of this territory could be developed, settlements made where settlements were possible, and thereby the wealth and power of the United States largely increased; and there was also the pressing want, in time of peace even, of an improved and cheaper method for the transportation of the mails, and of supplies for the army and the Indians.

"It was in the presence of these facts that Congress undertook to deal with the subject of this railroad. The difficulties in the way of building it were great, and by many intelligent persons consid-

ered insurmountable. * * * But the primary object of the government was to advance its own interests, and it endeavored to engage individual co-operation as a means to an end,—the securing a road which could be used for its own purposes." See also United States v. Denver & R. G. Ry. Co., 150 U.S. 1, 14 S.Ct. 11, 37 L.Ed. 975; Winona & St. Peter R. R. Co. v. Barney, 113 U.S. 618, 5 S.Ct. 606, 28 L.Ed. 1109.

**3.** Section 4, 43 U.S.C.A. § 937, required the location of each right of way to be noted on the land plats in the local land offices and "thereafter all such lands over which such right of way shall pass shall be disposed of subject to such right of way". The court reasoned that the reserved right to convey the lands subject to the right of way grant was wholly inconsistent with the grant of a fee. There was no such provision in any of the prior acts granting right of way.

significant that in speaking of Rio Grande Western Ry. Co. v. Stringham, 239 U.S. 44, 36 S.Ct. 5, 60 L.Ed. 136, which held that a railroad acquiring a right of way under the 1875 Act had a limited fee thereto, the court said:

"The conclusion that the railroad was the owner of a 'limited fee' was based on cases arising under the land-grant acts passed prior to 1871 and it does not appear that Congress' change of policy after 1871 was brought to the Court's attention. That conclusion is inconsistent with the language of the Act, its legislative history, its early administrative interpretation and the construction placed on it by Congress in subsequent legislation. We therefore do not regard it as controlling. Statements in Choctaw, O. & G. R. Co. v. Mackey, 256 U.S. 531, 41 S.Ct. 582, 65 L.Ed. 1076, and Noble v. Oklahoma City, 297 U.S. 481, 56 S.Ct. 562, 80 L.Ed. 816, that the 1875 Act conveyed a limited fee are dicta based on the Stringham case and entitled to no more weight than the statements in that case. * * * "

It appears to us that the language of the Great Northern case is such that no other conclusion can be reached than that had the court been considering right of way grants made prior to 1871, it would have followed the "limited fee" cases and held that such title carried with it the right to remove the minerals.

The effect of the Great Northern case was discussed in United States v. Illinois Central R. Co., D.C., 89 F.Supp. 17, 23, affirmed 7 Cir., 187 F.2d 374. In a well-considered opinion, it was held that "on the authority of the Northern Pacific case," the Illinois Central, under a grant prior to 1871, acquired a limited fee to the right of way lands which would entitle it to remove the minerals underlying the surface. We think the reasoning of that case is applicable here.[4]

■■ Generally the terms "limited", "determinable", "qualified", or "base" fee, as applied to the title of real estate, are used synonymously. Because of the possibility that it may endure forever, the owner of such an estate, so long as it exists, even though title may revert upon the happening of a condition, has the same rights as an owner in fee simple and may remove underlying minerals. 19 Am.Jur., Estates, Secs. 28, 30, 31; 31 C.J.S., Estates, §§ 9, 10; Restatement of Property, Sec. 193, Comment (h); United States v. Illinois Central R. Co., supra; Frensley v. White, 208 Okl. 209, 254 P.2d 982; Davis v. Skipper, 125 Tex. 364, 83 S.W.2d 318; Johnson Irrigation Co. v. Ivory, 46 Wyo. 221, 24 P.2d 1053; D.C., 126 F.Supp. 646.

4. In speaking of the effect of the Great Northern case, the court said in 89 F. Supp. at page 21:

"In the same opinion [the Great Northern opinion] the court distinguishes between the periods in the legislative and economic history of the United States from 1850 to 1871 and the period following 1871 in relation to the grants of lands from public domain to encourage the building of railroads and the Congressional attitude toward such grants. It points out that the period beginning in 1850 was characterized by a Congressional policy of subsidizing railroad construction by lavish grants from the public domain of which the Illinois Central Grant here in question, together with the Union Pacific Grant of July 1, 1862, Chap. 120, 12 Stat. at L. 489; the Amended Union Pacific Grant, Act of July 2, 1864, Chap. 216, 13 Stat. at L. 356; and the Northern Pacific Grant, Act of July 2, 1864, Chap. 217, 13 Stat. at L. 365, are referred to as being typical of the period. * * * "

At page 23 of 89 F.Supp., "On the authority of the Northern Pacific case it must be held that the defendant by its deed from the State of Illinois given pursuant to said grant in the Act of 1850, received and holds a limited fee in its right of way subject to an implied condition of reverter in the event it ceases to use or retain the right of way for the purpose for which it was granted. * * * "

The United States urges with special emphasis that the record illustrates that it was the policy of the United States, even during the period prior to 1871, to reserve the minerals in lands conveyed. We cannot accede to the correctness of this proposition. It assumes that a policy of retention of the full title to mineral lands is the same as a policy of conveying the fee and reserving the mineral rights. The governmental policy in effect at the time of the Union Pacific grant, was that a grant or conveyance by the United States carried with it the full title, including minerals. Clearly the Act of July 1, 1862 excludes mineral lands from the grant. As stated in Burke v. Southern Pacific R. R. Co., 234 U.S. 669, 34 S.Ct. 907, 913, 58 L.Ed. 1527, this "was not a mere reservation of minerals, but an exclusion of mineral lands". See also Terry v. Midwest Refining Co., 10 Cir., 64 F.2d 428, 434. The railroad company could not obtain any title to the mineral lands, if known at the time patent issued, but if, after title passed, it developed that the lands were mineral, the United States had no claim. The passing of title by patent or grant was a determination of the non-mineral character of the land. Burke v. Southern Pacific R. R. Co., supra; Barden v. Northern Pacific R. R. Co., 154 U.S. 288, 14 S.Ct. 1030, 38 L. Ed. 992. The exclusion of mineral lands was not confined to the railroad grants but to the homestead and other laws permitting the acquisition of public lands. Burke v. Southern Pacific R. R. Co., supra. The policy of conveying the fee and reserving minerals to the United States was not fully developed until the passage of the Stockraising Homestead Law in 1916, 43 U.S.C.A. § 291 et seq., and the Leasing Act of 1920, 30 U.S.C.A. § 181 et seq. We conclude that the Union Pacific, by the terms of the grant, received a limited fee title to its right of way and is entitled to remove the underground minerals.

Affirmed.