Sewell THOMAS, George K. Thomas, A. E. Pilkington, Gertrude Vandeveer Breckon, Frank R. Button, E. Roy Chesney, Don F. Anderson, E. J. Campbell, John A. McCusker, Jr., Roy L. Mason, Albert H. Vogler, Phillip H. Paden, Mrs. Elizabeth Root Paden, George W. Calkins, George E. Saunders, Thaddeus C. Naquin, Arthur H. Malnati, Orrin Abbott, Don J. Sebern, Leonard Delue and John L. Crum, Plaintiffs,

v.

UNION PACIFIC RAILROAD COMPANY, Defendant.

Civ. No. 5110.

United States District Court
D. Colorado.
March 27, 1956.

who seek leases for oil and gas under the Mineral Lands Leasing Act of February 25, 1920, as amended, 30 U.S.C.A. § 181 et seq. on the one hand, and the defendant Union Pacific Railroad Company which has reserved all oil, coal and other minerals in land conveyed by the United States of America to the defendant or its predecessors in title pursuant to Acts of Congress of July 2, 1864, July 3, 1866 and the Joint Resolution of Congress of March 3, 1869, known as the "Railroad Grants", on the other hand.

Inasmuch as the Motion to Dismiss is dispositive of the cause, it is necessary that the pleadings be set forth in some degree of detail. Jurisdiction of the Court is sought pursuant to the provisions of Title 28 U.S.C. § 1331, as the purported action of the plaintiffs is in rem between citizens of the United States, the matters and things in controversy, exclusive of interest and cost exceed the sum of $3,000, and the action involves the construction and effect of certain Congressional Acts, the Railroad Grant Acts above-mentioned, and the Federal Leasing Act. Each plaintiff claims lands in Adams County, State and District of Colorado, alleged to be available for Federal Oil and Gas Leases pursuant to the Mineral Lands Leasing Act of February 25, 1920, as amended, supra.

The Complaint alleges that the defendant Union Pacific Railroad Company obtained patent to said lands from the President of the United States, and that its patents contained the following restrictive clauses:

"Now know ye, that the United States of America, in consideration of the premises and pursuant to the said Acts of Congress, have given and granted and by these presents do give and grant unto the said 'the Union Pacific Land Company' and to its assigns the tracts of lands listed as aforesaid and described in the foregoing. Yet excluding and excepting from the transfer by these Presents 'all mineral lands should any be found to exist in the tracts described in the foregoing but this

George K. Thomas, Denver, Colo., for plaintiffs.

E. G. Knowles, Denver, Colo., Francis J. Melia, Omaha, Neb., Sidley, Austin, Burgess & Smith, Kenneth F. Burgess and D. Robert Thomas, Chicago, Ill., for defendant.

ROGERS, District Judge.

The ultimate question presented by the issues drawn between the defendant's Motion to Dismiss and the Complaint of some score of plaintiffs, concerns the relative rights of the plaintiffs

exclusion and exception according to the terms of the statute, shall not be construed to include coal and iron lands.' "

It is then alleged that the defendant acquired said lands either directly by said patents or by mesne conveyances from the grantee of the respective patents, and has since, by divers deeds conveyed the surface thereof to settlers, containing the following reservations for the benefit of the defendant Railroad:

"*Excepting and Reserving:* First all oil, coal and other minerals within or underlying said lands.

"Second: The exclusive right to prospect in and upon said land for oil, coal and other minerals within or underlying said lands, or which may be supposed to be therein, and to mine from and remove from said land, all oil, coal and other minerals which may be found thereon by anyone.

"Third: The right of ingress, egress and regress upon said land to prospect for, mine and remove any and all such oil, coal and other minerals, and the right to use so much of said lands as may be necessary or convenient for the right of way to and from said prospect places or mines and for road and approaches thereto or for removal therefrom of oil, coal, mineral, machinery or other material."

It is thereupon alleged that the defendant Railroad, by virtue of said Acts of Congress and patents, obtained title solely to such coal and iron as might be found within said lands, and at the time of deeding the surface thereof, had no right, title or interest in or to any oil, gas, or any other minerals "should any be found" therein. Plaintiffs allege that oil, gas and petroleum, including oil shales and kindred petroleum deposits on, in and under the public domain were "minerals" subject to placer mining location and patented under the Mining Laws of the United States; that the Act of Congress of February 25, 1920, as amended, withdrew all oil, gas and petroleum, the property of the United States, from location and patent and placed the same within the exclusive jurisdiction of the Department of the Interior, to be administered and leased to qualified persons by the Secretary of the Interior, as trustee thereof for the benefit of the people of the United States. Plaintiffs further allege that the defendant Railroad Company has leased the lands in question to others for prospecting for and producing therefrom such oil and gas as may be found therein, to the exclusive benefit of the defendant by reason of royalties to be paid from the same as sold for public commercial use and consumption, and that defendant has no right, title or interest therein, and that any and all oil and gas leases so made and outstanding are ultra vires and void.

Plaintiffs state that the defendant Railroad, having no right, title or interest in said oil and gas, is unjustly and illegally enriching itself at the expense of the United States of America, the sovereign owner thereof, and that defendant holds title to and possession of said oil and gas as an equitable trust for the benefit of those legally entitled to prospect for and recover the same.

Plaintiffs thereupon state that each is willing, ready and able to take and perform all the terms and conditions of their lease offers to the Federal Government for the development of said land, are able and willing to advance the rental required by the Government as a condition precedent to said lease, to give such bonds as Federal regulations require, and to pay royalties as specified by the Department of the Interior for similar lands.

It is alleged that the written offers of each of the plaintiffs were made to the Secretary of the Interior, and that as consolidated appeals, the same were heard by the Secretary, and by him rejected by Decision No. 71498, the following headnotes of said Decision being set forth in the Complaint:

"When the Department has issued a patent to a railroad under its grant, title vests in the railroad and

the Department has no further jurisdiction over the patented lands and must reject offers to lease for oil and gas covering such lands.

"An unrestricted patent to a railroad under its grant includes the title to the surface of the land and the mineral deposits under it.

"A clause in a patent of railroad grant lands which purports to except all mineral lands is void."

The remedies sought by the plaintiffs are:

First, that the Land Office decision rejecting the offers of the plaintiffs be reversed;

Second, that the defendant Railroad be declared to hold the oil and gas content of the lands in trust for the benefit of these plaintiffs; that all outstanding leases be held null and void;

Third, that the defendant Railroad make, execute and deliver to the plaintiffs as their interest may appear, oil and gas prospecting and production leases under the terms and conditions and at the rentals and royalties specified in the regulations of the Bureau of Land Management, Department of the Interior, for leases upon lands of similar character;

Fourth, that the defendant Railroad account for all oil and gas removed and sold from said lands to the lawful owner thereof, and lastly,

For such other and further relief in the premises as to the Court may seem meet and proper.

To this Complaint the defendant has levied a Motion to Dismiss and the grounds upon which said Motion is made, are the following:

1. That the Complaint fails to state a claim against said defendant upon which relief can be granted.

2. The Court lacks jurisdiction over the subject matter of this action, and

3. The Secretary of the Interior of the United States is an indispensable party to this action, and is not within the jurisdiction of the Court.

The Court will consider and dispose of each of said grounds in the order set forth in said Motion.

At the threshold of deciding the three points under consideration, it would be well to review the history and background of the Congressional Acts under consideration. Act of July 1, 1863, 12 Stat. 489; Act of July 2, 1864, 13 Stat. 356; Act of July 3, 1866, 14 Stat. 79, and Joint Resolution of Congress of March 3, 1869, 15 Stat. 348. See Appendix for pertinent excerpts from the first two Acts.

The population of the Nation, at that time torn asunder by the havoc of the Civil War, was but little more than thirty-two million. When the first of the three Acts of Congress was enacted, relations with Great Britain were in a most perilous state, and grave fears were had as to whether our Nation could retain our Pacific territory. While the Eastern and Mid-Western States had been built up with some degree of regularity, that part of our territory between the Missouri River and the Pacific Coast was essentially a virgin wilderness, peopled at the most by small Army units, traders, trappers and Indians. Commerce was conducted, to a great extent, in the populated portions of Central and Eastern United States by river flat boats, moving generally in a Northerly and Southerly direction. Commerce between the settled portion of the United States and the Western portion was conducted by wagon freighters and stage coaches. From the military viewpoint, protection of the Western lands from foreign countries, unification of the new country on the side of the Union, as against the Confederacy, and the protection of the settlers against the Indians, all made the construction of Easterly-Westerly continental railroads not only warranted, but imperative. Added to this was the desire of the National government that the vast Western domain be developed economically, as regards agricultural and mineral resources. The problems of financing the construction

of such a railroad, and of attracting capital to such a hazardous venture, were gigantic. Congress endeavored to solve these problems in part, at least, by means of the "Railway Land Grants" before us today for interpretation. For those interested in pursuing this background material, recourse should be had to the Supreme Court opinions in United States v. Union Pacific Railroad Co., 91 U.S. 72, 23 L.Ed. 224, and Platt v. Union Pacific Railroad Co., 99 U.S. 48, 25 L.Ed. 424. Congress, in these Acts, adopted a policy of granting a right of way to railroads and in addition, the fee title to large nonmineral lands lying within specified distances from the right of way (See Appendix).

As Judge Pickett, speaking for the Court of Appeals for the Tenth Circuit recently said, in United States of America v. Union Pacific R. Co., 230 F.2d 690:

"At the time Congress did not consider these grants as bounties or gratuities bestowed upon the railroads but a means of inducing capital to construct railroads, under the most hazardous conditions, for the benefit of the nation. The grants were in the nature of proposals which the company could accept or reject."

Turning, now, to a consideration of the first ground of the Motion to Dismiss, i. e., that the complaint fails to state a claim against defendant Railroad upon which relief can be granted, the Court is of the opinion that the point must be decided in favor of defendant Railroad, and adversely to the plaintiffs, for the reason that the question has been fully adjudicated in the case of Burke v. Southern Pacific Railroad Co., 1914, 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527. This case will be discussed in detail hereinafter, but a brief summary of the law just prior to the Burke case will not be amiss.

The theory of the Pacific Railroad Acts and the decisions relative thereto, rendered in the latter part of the Nineteenth Century, are well discussed in "The Law of Mines and Mining in the United States", by Barringer and Adams, published by Little, Brown & Co., 1897, at pages 532 to 540. This work on mines has the following to say on the point in question:

"Congress by various acts has granted to certain railroad corporations, land upon which to construct their roads, and also alternate sections of land lying contiguous to the road. Such are the Pacific Railroad Acts of July 1, 1862, and July 21, 1864. These acts contain exceptions of such sections as are mineral lands (see also Rev.Stats. 2346). This exception or reservation is absolute without reference to whether the land was known to be mineral or not at the time of the grant. These grants took effect *in praesenti*, but no mineral land passed by them. The character of the land is decided by the Land Department, and the discovery of mineral *at any time previous to the issuance of patent, or certification where patent is not required*, will except the land from the grant.

"This position has been constantly adhered to by the Department, patents being refused to the railroads where minerals have been discovered previous thereto; and this has been decided to be correct by the Supreme Court of the United States in Barden v. Northern Pac. R. Co., 154 U.S. 288, 14 S.Ct. 1030, 38 L.Ed. 992, by which a number of cases are overruled, in which it had been held that all land passed by the grant which was not known to be mineral at the time of the definite location of the road.

"When, however, a patent issues to the railroad or its grantee, it is conclusive, and cannot be attacked by those who claim that the land included therein was known to be mineral at the date of the grant. The question is always investigated by the Land Office before issuing a patent to the railroad; that decision is final, and after the patent has issued,

no application for a mineral patent for the land or any part of it will be entertained.

"In determining the character of these lands, the same test is applied as in determining what lands may be located as mines as against agricultural or other claimants. This has been discussed elsewhere. The procedure in the Land Office to determine the character of these lands is likewise the same.

"The exception in the acts does not apply to the land occupied by the roadbed which may be upon mineral land, but applies only to the contiguous alternate sections granted."

██ We accordingly find, then, that prior to the turn of the Twentieth Century, the law was settled that a patent regularly issued to a railroad, absent the element of fraud, is conclusive and cannot be attacked by those claiming that lands covered thereby were known to be mineral in nature at the time of the grant; that the Land Office investigation of the question prior to patent is final, and that subsequent to issuance of patent, no application from a third person for mineral rights will be entertained. These basic principles, alone, would, in the opinion of the Court, require a decision herein adverse to the plaintiffs. We are further fortified, however, by the Burke case, supra, the issues of which are so clearly within the ambit of the cause at Bar, that it is controlling herein. This opinion is written by Mr. Justice Van Devanter, covers some forty-two pages in the United States Reports, and typical of the written endeavors of its author, deals with painstaking detail and exactness with all of the problems involved in that cause.

The facts of the Burke case involve the construction and validity of patents for land issued to the Southern Pacific Company under the Land Grant Act of July 27, 1866, 14 Stat. 292, and the effect of provisions in the patents as to the effect of subsequent discovery of minerals in the lands covered thereby. The plaintiff Burke, in 1910, filed a Bill of Equity in the Circuit Court of the United States for the Southern District of California, against the Southern Pacific Railroad Company, the Kern Trading and Oil Company, and several individuals seeking a decree establishing certain rights claimed by him in land in California, and enjoining defendants from asserting any right or interest therein. A demurrer was sustained to the Bill in Equity, and a Decree was entered dismissing the Bills.

The acts under which the patents to the Southern Pacific Railroad were issued provided that "all mineral land shall be excepted from operation", of said acts and that "mineral lands" should "not be construed to include coal and iron land". It should be emphasized, here, that the statutes or Acts of Congress did not contain any reservation or exception as to "minerals", but rather, the exception was of "mineral lands" other than "coal and iron lands". The patents which are issued to the defendant Southern Pacific Railroad contained a clause quite similar in verbage, and to the Court, identical in legal meaning, to the one above quoted in the muniments of title issued to the defendant Union Pacific, and which read as follows:

"Excluding and excepting all mineral lands should any such be found in the tracts aforesaid, but this exclusion and exception, according to the terms of the Statute, shall not be construed to include coal and iron lands."

This clause is found at page 673 of the United States Report of the Burke case, 34 S.Ct. at page 909. The Court, in the Burke case, held specifically, that whether or not lands were "mineral lands" was a matter to be determined *at the time of the issuance of the patents* by the Land Office of the Interior Department, and such determination is not subject to collateral attack by third persons. It was further decided that any purported reservation or exception contained in the patents to the defendant Southern Pacific Railway, whereby said minerals were

subsequently discovered on said premises, were ultra vires of the Act upon which the patents were predicated, void and of no effect. The author of this opinion is tempted to quote liberally from the exhaustive opinion in the Burke case, but in the interests of time and of economy of paper, will resist the allure of so doing, but does desire to quote in full, the questions propounded and certified to The Supreme Court for opinion, and the answers made thereto, appearing, 234 U.S. on pages 709 to 711, 34 S. Ct. on page 923, as follows:

"Taking up the several questions in the light of what we have here said, we answer them as follows:

"1. Did the said grant to the Southern Pacific Railroad Company include mineral lands which were known to be such at or prior to the date of the patent of July 10, 1894?

"Answer.—Mineral lands, known to be such at or prior to the issue of patent, were not included in the grant, but excluded from it, and the duty of determining the character of the lands was cast primarily on the Land Department, which was charged with the issue of patents.

"2. Does a patent to a railroad company under a grant which excludes mineral lands, as in the present case, but which is issued without any investigation upon the part of the officers of the Land Office or of the Department of the Interior as to the quality of the land, whether agricultural or mineral, and without hearing upon or determination of the quality of the lands, operate to convey lands which are thereafter ascertained to be mineral?

"Answer.—A patent issued in such circumstances is irregularly issued, undoubtedly so, but as it is the act of a legally constituted tribunal and is done within its jurisdiction, it is not void, and therefore passes the title (Noble v. Union River Logging Railroad, 147 U.S. 165, 174–175, 13 S.Ct. 271, 37 L.Ed. 123, 126,

127), subject to the right of the Government to attack the patent by a direct suit for its annulment if the land was known to be mineral when the patent issued. (McLaughlin v. United States, 107 U.S. 526, 2 S.Ct. 802, 27 L.Ed. 621; Western Pacific Railroad Co. v. United States, 108 U.S. 510, 2 S.Ct. 802, 27 L.Ed. 806).

"3. Is the reservation and exception contained in the grant in the patent to the Southern Pacific Railroad Company void and of no effect?

"Answer.—The mineral land exception in the patent is void.

"4. If the reservation of mineral lands as expressed in the patent is void, then is the patent, upon a collateral attack, a conclusive and official declaration that the land is agricultural, and that all the requirements preliminary to the issuance of the patent have been complied with?

"Answer.—It is conclusive upon a collateral attack.

"5. Is petroleum or mineral oil within the meaning of the term 'mineral,' as it was used in said acts of Congress reserving mineral land from the railroad land grants?

"Answer.—Petroleum lands are mineral lands within the meaning of that term in railroad land grants.

"6. Does the fact that the appellant was not in privity with the Government in any respect at the time when the patent was issued to the railroad company prevent him from attacking the patent on the ground of fraud, error, or irregularity in the issuance thereof as so alleged in the bill?

"Answer.—It does.

"7. If the mineral exception clause was inserted in the patent with the consent of the defendant, Southern Pacific Railroad Company, and under an understanding and agreement between it and the officers of the Interior Department that said clause should be effective to keep in the United States title to

such of the lands described in the patent as were in fact mineral, are the defendants, Southern Pacific Railroad Company and the Kern Trading and Oil Company, estopped to deny the validity of said clause?

"Answer.—No; such an agreement is of no greater force as an estoppel than the execption in the patent. The latter being void, the patent passes the title and is not open to collateral attack, or to attack by strangers whose only claim was initiated after the issue of the patent."

The plaintiffs, in their brief filed herein, in opposition to the defendant's brief, state that the Burke opinion is as extinct as the Dodo Bird. That this is not a correct appraisal of the Burke case, and that the Burke case is still a living, breathing authority for principles set forth in the quoted portion therefrom, is evidenced from the opinion from Judge Pickett in United States of America v. Union Pacific Railroad Company, supra, decided February 24, 1956, in which the Burke case is either cited or quoted from with approval, three times. The Court of Appeals for the Tenth Circuit, in said opinion, had the following to say on the point at Bar:

" * * * The governmental policy in effect at the time of the Union Pacific grant, was that a grant or conveyance by the United States carried with it the full title, including minerals. Clearly the Act of July 1, 1862 excludes mineral lands from the grant. As stated in Burke v. Southern Pacific R. Co., 234 U.S. 669, 34 S.Ct. 907, 913, 58 L.Ed. 1527, this 'was not a mere reservation of minerals, but an exclusion of mineral lands'. See also Terry v. Midwest Refining Co., 10 Cir., 64 F.2d 428, 434. The railroad company could not obtain any title to the mineral lands, if known at the time patent issued, but if, after title passed, it developed that the lands were mineral, the United States had no claim. The passing of title by patent or

grant was a determination of the non-mineral character of the land. Burke v. Southern Pacific R. Co., supra; Barden v. Northern Pacific R. Co., 154 U.S. 288, 14 S.Ct. 1030, 38 L.Ed. 992. The exclusion of mineral lands was not confined to the railroad grants but to the homestead and other laws permitting the acquisition of public lands. Burke v. Southern Pacific R. Co., supra. The policy of conveying the fee and reserving minerals to the United States was not fully developed until the passage of the Stockraising Homestead Law in 1916, 43 U.S. C.A. § 291 et seq., and the Leasing Act of 1920, 30 U.S.C.A. § 181 et seq. We conclude that the Union Pacific, by the terms of the grant, received a limited fee title to its right of way and is entitled to remove the underground minerals."

The plaintiffs, in their extensive brief, seek to trace the history of Congressional acts from a point a few years after the enactment of the Pacific Railroad Grants down through the Federal Leasing Act of 1920, 30 U.S.C.A. § 181 et seq., in an effort to develop their theory that Congressional action has abrogated the effect of the Burke decision, and an analysis of this Congressional history does not substantiate plaintiffs' theory, and on the other hand, would tend to indicate that Congress at no time has sought to mitigate against the principles announced in that case, as they apply to the Pacific Railroad Grants. Plaintiffs urge, with considerable vigor, that the true applicable rule is to be found in the case of Standard Oil Co. of California v. United States, 107 F.2d 402, decided by the Court of Appeals for the Ninth Circuit in 1939. This case is well evaluated by the Solicitor to the Secretary of the Department of the Interior, in the opinion filed in the plaintiffs' consolidated appeals in the instant case, wherein it is stated:

" * * * However that case (Standard Oil case, supra) dealt with a school land grant to a State

which had never been patented and which the department had not determined to be non-mineral at the time when title normally would have passed to the State."

■ After considering all of the phases of the issue presented by the First ground urged by the defendant, the Court is of the considered opinion that the Complaint of the plaintiffs fails to state a claim against the defendant upon which relief can be granted.

As to the Second ground that the Court is without jurisdiction over the subject matter of this action, this attack upon the jurisdiction of the Court is based upon the limited sense of jurisdiction as it applies to the subject matter of the action, and may be considered as directed to the proposition that the Court has not jurisdiction to try and determine a collateral attack on the patents issued by the United States to the predecessors of the defendant Railroad Company.

■ A patent issued by the United States of America so vests title in the lands covered thereby, that thereafter the same cease to be a part of the public domain. Developing from this rule, it is the further general rule that, such patents are not open to collateral attack. See Diamond Coal & Coke Co. v. United States, 233 U.S. 236, 34 S.Ct. 507, 58 L. Ed. 936; Burke v. Southern Pacific Railroad Co., supra, and United States v. Price, 111 F.2d 206, the latter case being a 1940 opinion of the Court of Appeals for the Tenth Circuit. In addition to the proposition that the Court will not entertain jurisdiction to adjudicate a collateral attack upon a Federal patent, is the statutory status of mineral rights at the present time, as a result of the enactment of the Leasing Act of 1920, supra, the effect of which was to withdraw from location all oil, gas and petroleum lands which were, at that time, property of the United States, and to place the same within the exclusive jurisdiction of the Department of the Interior, to be administered by the Secretary of the Interior. That the Secretary's actions and deter-

minations, as regard said lands and mineral interests as to leasing said lands are not subject to judicial review, even in direct proceedings; see Dunn v. Ickes, 72 App.D.C. 325, 115 F.2d 36, and United States, ex rel. Jordan v. Ickes, 79 U.S. App.D.C. 114, 143 F.2d 152. Accordingly, the Court rules that it lacks jurisdiction to adjudicate the subject matter of the plaintiffs' Complaint.

■ We now must determine the third ground of the defendant's Motion to the effect that the Secretary of the Interior of the United States is an indispensable party to this cause, and he is not within the jurisdiction of the Court. On this point recourse should be had to the Complaint on file herein, and a reading of the relief demanded reveals the following:

"Wherefore Plaintiffs pray:

"1. That the Land Office decision of December 22, 1954, rejecting the offers of these plaintiffs respectively, be reversed * * *."

We are thus confronted in the first demand for relief, with the prayer that the action of the Secretary of the Interior heretofore taken in regard to the plaintiffs' claims, be reversed. It is also interesting to note that paragraph II of the Complaint states, in effect, that the plaintiffs' offers for United States oil and gas leases reached the Secretary of the Interior, and on December 22, 1954, were rejected by Decision Number 71498 *"by the defendant, The Secretary of the Interior of the United States."* The phrase "by the defendant" was no doubt an inadvertence on the part of plaintiffs' pleader, but it demonstrates that the plaintiffs are seeking direct relief from the Interior Secretary's actions herein.

Under the very terms of the Leasing Act of 1920, supra, the Secretary of the Interior is the sole person authorized to grant leases thereunder, and he it is who would be authorized to act in this case, if the lands in question were subject to that Act. The Secretary of the Interior would accordingly be an indis-

pensable party to this action. See Sellas v. Kirk, 9 Cir., 200 F.2d 217; Warner Valley Stock Co. v. Smith, 165 U.S. 28, 17 S.Ct. 225, 41 L.Ed. 621; Webster v. Fall, 266 U.S. 507, 45 S.Ct. 148, 69 L.Ed. 411, and Tribal Council of Blackfeet Indian Reservation, Mont. v. Ickes, D.C., 58 F.Supp. 584. The Secretary of the Interior, in his official capacity, is suable only in the District Court of the United States within and for the District of Columbia. See Blackfeet Indian Reservation case, supra; Carr v. Desjardines, D.C., 16 F.Supp. 346; Nesbitt Fruit Products v. Wallace, D.C., 17 F.Supp. 141, and several other lower court decisions. Inasmuch as the Secretary of the Interior is not within the jurisdiction of this Court, service cannot be had upon him, and hence this cause must fail.

A Judgment in conformity with this opinion should be submitted within 20 days from the date hereof.

### Appendix

12 Stat. 489, Sec. 3:

"Sec. 3. *And be it further enacted,* That there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a preemption or homestead claim may not have attached, at the time the line of said road is definitely fixed: Provided, That all mineral lands shall be excepted from the operation of this act; but where the same shall contain timber, the timber thereon is hereby granted to said company. And all such lands, so granted by this section, which shall not be sold or disposed of by said company within three years after the entire road shall have been completed, shall be subject to settlement and preemption, like other lands, at a price not exceeding one dollar and twenty-five cents per acre, to be paid to said company."

13 Stat. 356, Sec. 4:

"Sec. 4. *And be it further enacted,* That section three of said act be hereby amended by striking out the word 'five,' where the same occurs in said section, and by inserting in lieu thereof the word 'ten;' and by striking out the word 'ten,' where the same occurs in said section, and by inserting in lieu thereof the word 'twenty.' And section seven of said act is hereby amended by striking out the word 'fifteen,' where the same occurs in said section, and inserting in lieu thereof the word 'twenty-five.' And the term 'mineral land,' wherever the same occurs in this act, and the act to which this is an amendment, shall not be construed to include coal and iron land. And any lands granted by this act, or the act to which this is an amendment, shall not defeat or impair any preemption, homestead, swamp land, or other lawful claim, nor include any government reservation or mineral lands, or the improvements of any bona fide settler, or any lands returned and denominated as mineral lands, and the timber necessary to support his said improvements as a miner or agriculturist, to be ascertained under such rules as have been or may be established by the commissioner of the general land-office, in conformity with the provisions of the preemption laws: Provided, That the quantity thus exempted by the operation of this act, and the act to which this act is an amendment, shall not exceed one hundred and sixty acres for each settler who claims as an agriculturist, and such quantity for each

settler who claims as a miner, as the said commissioner may establish by general regulation: Provided, also, that the phrase 'but where the same shall contain timber, the timber thereon is hereby granted to said company,' in the proviso to said section three, shall not apply to the timber growing or being on any land farther than ten miles from the centre line of any one of said roads or branches mentioned in said act, or in this act. And all lands shall be excluded from the operation of this act, and of the act to which this act is an amendment, which were located, or selected to be located, under the provisions of an act entitled 'an act donating lands to the several states and territories which may provide colleges for the benefit of agriculture and the mechanic arts,' approved July second, eighteen hundred and sixty-two, and notice thereof given at the proper land-office."

30 U.S.C.A. § 226:

"All lands subject to disposition under sections 181–184, 185–188, 189–194, 201, 202–209, 211–214, 223, 224–226, 226d, 226e, 227–229, 241, 251, 261–263 of this title which are known or believed to contain oil or gas deposits may be leased by the Secretary of the Interior. When the lands to be leased are within any known geological structure of a producing oil or gas field, they shall be leased to the highest responsible qualified bidder by competitive bidding under general regulations, in units of not exceeding six hundred and forty acres, which shall be as nearly compact in form as possible, upon the payment by the lessee of such bonus as may be accepted by the Secretary and of such royalty as may be fixed in the lease which shall be not less than 12½ per centum in amount or value of the production removed or sold from the lease. When the lands to be leased are not within any known geological structure of a producing oil or gas field,

the person first making application for the lease who is qualified to hold a lease under said sections shall be entitled to a lease of such lands without competitive bidding. Such leases shall be conditioned upon the payment by the lessee of a royalty of 12½ per centum in amount or value of the production removed or sold from the lease. Leases issued under this section shall be for a primary term of five years and shall continue so long thereafter as oil or gas is produced in paying quantities."