BLACKFEET TRIBE OF The BLACK-FEET INDIAN RESERVATION, Plaintiff,

v.

KLIES LIVESTOCK COMPANY, a corporation; Great Falls National Bank; The United States of America; and Martha Klies, a woman, Defendants.

Civ. No. 1902.

United States District Court
D. Montana,
Great Falls Division.

March 7, 1958.

---

Cedor B. Aronow, Shelby, Mont., for plaintiff.

H. Cleveland Hall, Great Falls, Mont., for defendant Martha Klies.

Krest Cyr, U. S. Atty., Butte, Mont., for defendant U. S.

JAMESON, District Judge.

This suit was instituted in the District Court of the Ninth Judicial District of the State of Montana, in and for the County of Glacier. The United States of America was joined as a defendant pursuant to Title 28 U.S.C.A. § 2410, and removed the case to this court, as authorized by Title 28 U.S.C.A. §§ 1444 and 1446.

The plaintiff is a tribe of American Indians organized as a corporation under the Act of June 18, 1934, (48 Stat. 987, 25 U.S.C.A. §§ 476, 477) and is authorized to sue and be sued in its own name. The Blackfeet Tribe, through its Tribal Council, entered into a contract in writing with Klies Livestock Company on July 17, 1945 to purchase certain lands within the boundaries of the Blackfeet Indian Reservation together with certain personal property for the sum of $35,000, —$10,000 down and the remainder in annual installments of $2,500 plus interest. The plaintiff was to have immediate possession upon the down payment, title to remain in the seller until payment in full. The deed of conveyance and bill of sale were placed in escrow with the defendant Great Falls National Bank, to be delivered in accordance with the terms of the agreement. The agreement contained the following provisions pertinent to the disposition of this case:

"Upon the completion of the payments of the sums herein set forth to be paid second party shall receive deeds of conveyance and bill

of sale conveying the said property above described and mentioned to the second party clear of incumbrance except oil lease to Texas Co. and subject to reservations in patents and deeds." \* \* \*

"The second party agrees to pay all taxes and assessments lawfully levied or assessed against said property promptly and before the same shall become delinquent except that the first party agrees to pay the first installment of the 1945 taxes to become due November 30, 1945. All taxes prior to 1945 on said property to be paid by first party."

Subsequent to the execution of this agreement all interest therein was assigned by the Klies Livestock Company to defendant Martha Klies. Thereafter the corporation was dissolved and has filed a disclaimer of any interest in this action. This defendant will hereafter be referred to as Klies.

Plaintiff was informed by the Superintendent of the Blackfeet Indian Agency, by letter dated March 10, 1954, (Exhibit 1) that there was owing to the United States various construction, operation, and maintenance charges assessed against a part of the land covered by the agreement by reason of the construction and operation of the Piegan Irrigation Project. These charges, according to the letter, were assessed for 1933 and prior years and, with interest, would amount to $4,394.51 on December 31, 1954, after which interest would accumulate at the rate of $\frac{1}{2}$ of 1% per month on the principal of the operation and maintenance charges.

On March 15, 1954, plaintiff sent a copy of the statement of these charges to Klies, taking the position that it was "an obligation which should be paid before title to the property is transferred to the tribe." (Exhibit 2). Subsequent thereto, there was considerable correspondence between counsel for plaintiff and defendant Klies with respect to these charges.

On November 12, 1956, Martha Klies, by her attorney, served a "Notice of Cancellation of Contract" (Exhibit 8) upon plaintiff, reciting failure to pay the principal installments due November 1, 1955 and November 1, 1956, and interest subsequent to November 11, 1953, and giving notice of cancellation and forfeiture unless the balance due under the contract, $5,894.17, was paid on or before December 14, 1956. On December 17, 1956 demand was made upon the defendant Great Falls National Bank for surrender of the instruments held in escrow. (Exhibit 9).

This action was commenced on December 10, 1956, for a decree quieting title in plaintiff, an order prohibiting defendant Klies from cancelling the agreement, and for "such orders as may be proper" for the disbursement of the sum of $5,894.17, which plaintiff deposited with the Clerk of Court. This deposit was on October 4, 1957 transferred to the registry of this court.

After removal to this court, the defendant United States filed an answer and cross-complaint, alleging in the latter that the sum of $4,394.51 claimed by the government for construction, operation and maintenance charges is secured by a lien on the lands concerned and praying for an order of the court directing the payment of that amount plus interest from December 31, 1954, out of the funds on deposit with this court.

The defendant Great Falls National Bank, holder of the deed and bill of sale under the escrow agreement, seeks an order directing the method of completing the escrow agreement.

Defendant Martha Klies, in separate answers to plaintiff's complaint and cross-complaint of the United States, takes the position that plaintiff's claim is barred by laches; that the contract for sale was cancelled and that she is entitled to immediate possession of the property covered by the contract; that the construction, operation, and main-

tenance charges do not constitute a lien against the land; and that if such charges do constitute a lien, the plaintiff is obligated therefor under the agreement.

The matter came on for trial before the court without a jury and was submitted by stipulation of counsel upon an agreed statement of facts and exhibits.

The predecessors in interest of plaintiff acquired title to the lands in question as purchasers of Indian allotments. Patents issued to Ed Klies covering a portion of the lands, most of them dated February 12, 1930, contained a provision that they were subject to a lien for costs and charges due the United States on account of the construction of the irrigation system, pursuant to Act of Congress of May 18, 1916 (39 Stat. 123). One patent, issued November 2, 1936, referred also to supplementary acts of March 7, 1928 (45 Stat. 200–210) and July 1, 1932 (47 Stat. 564–565, 25 U.S. C.A. § 386a). Patents covering the remaining lands issued to J. B. Long & Co., August 2, 1923, contained no reservations with respect to such lien.

Does the United States hold a lien which may be enforced in this action through payment from the funds deposited by plaintiff in the registry of this court?

Pertinent acts of Congress relied upon by the respective parties may be summarized as follows:

An Act of March 1, 1907 (34 Stat. 1015, 1034–1039) appropriated money to the Bureau of Indian Affairs to survey and allot lands in Montana to Indian families and to fulfill obligations of treaties. This act provided that after allotment to Indians of reservation land, the remaining land should be classified and disposed of under general homestead laws; that land under irrigation projects was subject to withdrawal and disposal under the Reclamation Act (32 Stat. 388, 43 U.S.C.A. § 391 et seq.) with payment to be made for construction and maintenance charges; and that if the land remained undisposed of after 5 years it might be sold for cash. The Reclamation Act provided in Section 5 that the entryman, in addition to complying with homestead laws, should pay charges assessed against the tract by reason of irrigation projects, before receiving a patent to the land.

An Act of August 1, 1914 (38 Stat. 582, 593) provided under Section 9:

"For continuing the construction of irrigation system to irrigate the lands of the Indians of the Blackfeet Indian Reservation, in Montana, including the necessary surveys, plans, and estimates, $50,000, reimbursable in accordance with the provisions of the Act of March first, nineteen hundred and seven, and to remain available until expended."

An Act of May 18, 1916 (39 Stat. 123, 140–141) provided in part:

"For continuing construction of the irrigation systems on the Blackfeet Indian Reservation, in Montana, $25,000 (reimbursable), which shall be immediately available: *Provided,* That the entryman upon the surplus unallotted lands to be irrigated by such systems shall, in addition to compliance with the homestead laws, before receiving patent for the lands covered by his entry, pay the charges apportioned against such tract as herein authorized, and a failure to make any two payments when due shall render the entry subject to cancellation, with the forfeiture to the United States of all rights acquired under the provisions of this act, as well as of any moneys paid on account thereof. The purchaser of any Indian Allotment to be irrigated by such systems, purchased upon approval of the Secretary of the Interior, before the charges against said allotment herein authorized shall have been paid, shall pay all charges remaining unpaid at the time of such purchase and in all patents or deeds for such purchased allotments, and also in all patents in fee to allottees or their heirs issued

before payment of all such charges herein authorized to be made against their allotments, there shall be expressed that there is reserved upon the lands therein described a lien for such charges, and such lien may be enforced, or, upon payment of the delinquent charges, may be released by the Secretary of the Interior."

In an Act of February 14, 1920 (41 Stat. 408, 409, 421) the Secretary of Interior was authorized and directed to require owners of irrigable land under any irrigation systems heretofore or hereafter constructed for the benefit of Indians to begin partial reimbursement at such times and in such amounts as he may deem best, and a further sum was appropriated "for continuing construction, maintenance, and operation of the irrigation systems on the Blackfeet Indian Reservation in Montana, $25,000 (reimbursable) * * *".

An Act of March 7, 1928 (45 Stat. 200, 210, provided further funds similarly conditioned—i.e., "reimbursable" for use on any irrigation system or reclamation project for which funds were not otherwise available, and contained the following proviso:

" * * * Provided further, That the costs of irrigation projects and of operating and maintaining such projects where reimbursement thereof is required by laws shall be apportioned on a per acre basis against the lands under the respective projects and shall be collected by the Secretary of the Interior as required by such law, and any unpaid charges outstanding against such lands shall constitute a first lien thereon which shall be recited in any patent or instrument issued for such lands."

In the Act of June 22, 1936 ("White Leavitt Act", 49 Stat. 1803, 25 U.S.C.A. § 389) Congress provided that the Secretary of Interior was "authorized and directed to cause an investigation to be made to determine whether the owners of non-Indian lands under Indian irrigation projects * * * are unable to pay irrigation charges" and where he found the landowners were unable to make payment by reason of certain enumerated causes, "he may adjust, defer, or cancel such charges, in whole or in part". The Act (Section 6, 25 U.S.C.A. § 389e) further provided for reports to Congress "from time to time" showing the action taken, and that: "No proceedings under sections 389 to 389d of this title shall become effective until approved by Congress."

An order (Exhibit 13) entered May 19, 1939 by Harold L. Ickes, then Secretary of the Interior, ordered, with respect to the Blackfeet Irrigation Project in Montana, "that the collection of irrigation construction charges, also the collection of delinquent irrigation operation and maintenance charges which accrued prior to the calendar year 1939 be deferred, subject to confirmation by Congress as provided in Section 6 of said Act, until the investigation referred to can be completed."

The action of the Secretary in deferring these charges was approved by Joint Resolution of Congress, April 11, 1940 (54 Stat. 105), the resolution reciting in part that whereas "an investigation * * * is contemplated within the near future" and the Secretary of the Interior "has deferred certain irrigation charges against lands of the said project which are now delinquent or will become due and payable before the proposed investigation can be completed", the action of the Secretary in deferring such charges "is hereby approved".

As noted above, the assessments were for 1933 and prior years. The total amount of $4,394.51 claimed as of December 31, 1954 consists of operation and maintenance principal in the sum of $1,445.88, interest thereon in the sum of $1,993.75 and construction principal in the sum of $954.88. Interest is claimed on the operation and maintenance charges subsequent to December 31, 1954, so that of the total now claimed approximately one-half represents interest at 6% per annum,—a strange result with respect

to assessments which had been deferred by the Secretary of the Interior with the approval of Congress and in which no further action has been taken by either the Secretary or Congress to provide for their collection.

Positive legislative enactments are necessary to the existence and preservation of a lien against the land. United States v. Beaver Run Coal, 3 Cir., 1938, 99 F.2d 610. Appropriation measures providing for reimbursement are not sufficient, creating a personal obligation only. See Cohen, Handbook of Federal Indian Law, Section 7, Reclamation and Irrigation p. 249. See also: Opinion of the Solicitor to the Secretary of Interior, dated December 15, 1922 (49 L.D. 370), wherein it was observed that the Secretary of Interior would be unable to create liens on the land without legislative authority, citing Burke v. Southern Pacific Railroad Company, 1914, 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527. The authority for such liens must exist when the patents are issued. United States v. Heinrich, D.C.Mont.1926, 12 F.2d 938 and cases there cited, affirmed 9 Cir., 16 F.2d 112. See also: Opinion of the Solicitor, Dept. of Interior, dated Sept. 9, 1929, (52 L.D. 709).

The requisite authority in the instant case is found in the Act of May 18, 1916, supra, and with respect to some of the lands in the Act of March 7, 1928, supra.

In determining whether the United States has a presently enforcible lien, two questions are presented: (1) May a lien be claimed and enforced as to those lands where there was no reservation in the patents; and (2) what is the effect of the order deferring collection with respect to all of the lands?

This is not a case where an act of Congress provides for the reservation of minerals or other title in the United States and through inadvertence the patent is issued without reciting the reservation. In such cases it has been held that the patent does not convey what the law reserved and that all persons are charged with notice of the reservation regard-

less of the failure of any federal official to incorporate it in the patents. United States v. Frisbee, D.C.Mont.1944, 57 F. Supp. 299, 300 and cases there cited.

Where a factual determination is required by a department of the government, a different rule obtains. It was held in Burke v. Southern Pacific Railroad Company, 1914, 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527, that a determination by the Land Office of the Department of Interior, without any investigation or hearing, that certain lands were not "mineral lands" (which were excluded from the Act under which patents to the railroads were issued) and the issuance of a patent for such lands to the railroad operated to pass title to the patentee, subject only to a right in the government to attack the patent by a direct suit for annulment if the land was known to be mineral when the patent issued. See also Thomas v. Union Pacific Railroad Company, D.C.Colo., 1956, 139 F.Supp. 588; United States v. Union Pacific Railroad Company, 10 Cir., 1956, 230 F.2d 690, 695; Barden v. Northern Pacific R. R. Co., 154 U.S. 288, 14 S.Ct. 1030, 38 L.Ed. 992.

While these cases are not precisely in point, the situation here is analogous. The issuance of the patent without restriction was an implied determination by the Land Office and the Secretary of Interior that no lien existed against the land conveyed. There was the possibility that charges against the land had been paid prior to issuance of patent or even as a condition to the issuance.

A subsequent purchaser was not put on notice of any requirement that a lien be reserved in all patents issued, for in fact there was no such requirement. (See Act of May 18, 1916; 39 Stat. 123, 140–141, supra). Here a determination by the Secretary that the land had been benefitted from the government financed irrigation project and that reimbursable charges were still due and owing was a prerequisite to the reservation of a lien. When the patent was issued without re-

citing any lien, third parties were entitled to assume that a determination of the non-existence of any lien had been made. The Solicitor to the Secretary of Interior, in an opinion dated January 30, 1928 (52 L.D. 262), said in part: " * * * every patent for public lands carries with it an implied affirmation or finding of every fact made a prerequisite to its issue. Polk's Lessee v. Wendell, 9 Cranch 87, 3 L.Ed. 665; Steel v. St. Louis Smelting & Refining Co., 106 U.S. 447, 1 S.Ct. 389, 27 L.Ed. 226. No executive officer of the government is authorized to reconsider the facts on which it was issued, and to recall or rescind it * * *." See also: United States v. Union Pacific Railroad Company, supra, 230 F.2d at page 693, and cases there cited.

█ The conveyance itself to the patentee was effective subject only to a direct action by the government to attack the patent if in fact it had been procured by fraud or mistake and a lien should have been recited. Burke v. Southern Pacific Railroad Co., supra. See also: Opinions of the Solicitor to the Secretary of Interior dated December 15th, 1922 (49 L.D. 370) and November 6, 1926 (51 L.D. 613). In the latter it was said: "Hence, in the absence of an express agreement between parties to that effect I am unable to see how a subsequent lessee or owner can be held accountable for the delinquencies of a former occupant of the same premises. This is particularly true in those cases where no lien is retained for repayment of the irrigation charges. Where no lien exists for repayment of the irrigation charges and where purchasers buy direct from the Indians without having agreed to assume an indebtedness resting against a former Indian owner such purchasers cannot be required to assume the indebtedness by a refusal to deliver water until he agrees to pay * * *. In its final analysis it would simply be equivalent to creating or enforcing a lien where none exists." Therein, an opinion of the Attorney General (33 Ops.Atty.Gen. 25) is cited as holding that purchasers of Indian Allotments who paid estimated construction charges before receiving patents cannot thereafter be held liable for additional payments by reason of error on the part of the government agents.

█ The patents in which no lien was reserved were issued in 1923, and the existence of any lien accordingly would depend entirely upon the Act of May 18, 1916, supra. The government could not assert a lien under enactments subsequent to the patent. United States v. Heinrich, D.C.Mont.1926, 12 F.2d 988, affirmed 9 Cir., 16 F.2d 112.

█ Nor is there evidence of any agreement between the government and patentees for the payment of the irrigation charges by the patentees. In the absence of such agreement, it is my opinion that the irrigation charges in question do not constitute a lien against those lands where no lien was reserved in the patent.

We come now to the question of the effect of the White-Leavitt Act of June 22, 1936 (49 Stat. 1803, 25 U.S.C.A. § 389), the order of the Secretary of the Interior of May 19, 1939, deferring the collection of the charges, and the Joint Resolution of Congress of April 11, 1940 (54 Stat. 105) approving this order.

█ Counsel for the United States argue that, under the language used in the Joint Resolution, no final action was contemplated until the investigation was completed and a finding was made by the Secretary as to "ability to pay on the part of the Blackfeet Tribe"; that 18 years have elapsed since the order was made by the Secretary and 17 years since the approving Resolution was adopted by Congress and that no further action has been taken by the Secretary; and that the order of the Secretary "expired from the non-performance of essential conditions and is now a dead letter". Counsel argue further that plaintiff and defendant Klies might, during that period, have requested the Department to complete the statutory requirement "for a final order for some

kind of relief"; that there is nothing to show that such a request was made and that "18 years of neglect on the part of the parties who might have asserted the relief makes a case of laches".

Counsel rely upon the case of United States v. Arenas, 9 Cir., 1947, 158 F.2d 730, 746, where an Indian had received a certificate of selection for an allotment, and 17 years later, after the Indian had made many improvements, the schedule was disapproved because of a change of land policy. The court held that the Indian had acquired an equitable title to the land and was entitled to the issuance of an allotment trust patent. The court said that the unprecedented delay constituted "neglect on the part of the department", and held that, "Where an Indian has done all that is necessary and that he can do to become entitled to land, and fails to attain the right through the neglect or misconduct of public officers, the courts will protect him in such right".

I fail to see where this case supports the government's position here. On the contrary, in both cases the government in effect attempted to rely upon inaction of the Secretary to the detriment of the other party,—in the Arenas case by contending that the Secretary was permitted to exercise his discretion, in spite of his long delay; and in the instant case, by contending that by reason of his inaction for 18 years, the order of the Secretary, approved by resolution of Congress, became a nullity. The government was not permitted in the Arenas case to take advantage of the inaction of the Secretary; nor should it be permitted in this case.

Counsel for the government argue further that the Joint Resolution of April 11, 1940 (54 Stat. 105) approving the order of deferment was not a law. This is true, but the order of deferment was made pursuant to the Act of June 22, 1936, which required approval of Congress before any order issued pursuant thereto could become effective. Congress could at any time have directed an inquiry with respect to the investigation for which the Act of 1936 provided.

It is true that there is nothing in the record to show that either plaintiff or defendant Klies ever requested the Department "to complete the statutory requirement for a final order for some kind of relief". The Act itself did not impose any such obligation on the part of the landowners. The fact that they did not request further action by the Secretary would not relieve the Secretary of his duty to proceed in accordance with the provisions of the Congressional Act or permit the government now to rely upon his inaction by reason of a failure of the landowners to make such a request.

On September 23, 1944, the Solicitor of the Department of the Interior issued an Opinion (58 I.D. 745) with respect to another project where charges had been deferred. There the Secretary had completed his investigation and found that the collection of the deferred charges should be resumed. It was the opinion of the solicitor that the charges became collectible upon the determination of the Secretary. While not concerned with the point here in controversy, certain language of the opinion is pertinent. The Solicitor referred to the "moratorium which remains in effect as long as the investigation has not been completed", and makes this statement: "Perhaps the most important factor is the reliance of private parties upon an administrative decision, with a resulting change in position involving economic detriment, and this factor has been given great weight by our courts. (Citing Cases)." In that opinion, the Solicitor raised, but left unanswered, the question raised by the government here, in commenting that it was difficult to believe that Congress in affirming the Department order deferring the charges intended to grant what might amount to a perpetual moratorium, and in suggesting that it might be argued that it was the intention of Congress to limit the moratorium to such time as would

reasonably be necessary to complete the investigation.

In the absence of any provision in the White-Leavitt Act of June 22, 1936, prescribing the period within which the investigation must be made, I cannot escape the conclusion that the deferral of the charges is still effective, pending further action by the Secretary or Congress.

Accordingly, it is my opinion with respect to the charges assessed against those lands where a lien was reserved in the patents that the order deferring the charges is still effective and the United States cannot enforce its lien or collect any delinquent charges in this action.

In view of the holding that there is nothing now due the United States, it is unnecessary to determine whether plaintiff or defendant Klies would be obligated to pay these charges should it later be determined by appropriate action of the Secretary of the Interior or Congress that all or some part of the charges are collectible. Since the question has been raised, however, I will comment briefly on the provisions of the contract which may be pertinent to a determination of this question in the event there is a later action to enforce collection.

The contract provides that Klies will convey to plaintiff "free and clear of encumbrance * * * and subject to reservations in patents and deeds". Plaintiff agreed to pay "all taxes and assessments lawfully levied or assessed against said property" * * * except that Klies "agrees to pay the first installment of the 1945 taxes to become due November 30, 1945" * * * and "all taxes prior to 1945".

The irrigation charges are assessments but not taxes. Vail v. Custer County, Mont.1957, 315 P.2d 993; State ex rel. Molott v. Board of County Commissioners, 1930, 89 Mont. 37, 296 P. 1; Cosman v. Chestnut Valley Irr. Dist., 1925, 74 Mont. 111, 239 P. 879, 40 A.L.R. 1344. The contract differentiates between taxes and assessments. This con-

clusion is strengthened by the reference to "taxes to become due November 30, 1945", indicating that the parties had in mind property taxes collected by the County Treasurer. This differentiation between taxes and assessments must be recognized and given effect. In the absence of an agreement by Klies to pay the deferred charges, plaintiff would be obligated therefor where the lien was reserved in the patents.

There remains for consideration the question of whether the defendant Martha Klies, as successor in interest of Klies Livestock Company, is entitled to a recision and cancellation of the contract and possession of the property. The contract between plaintiff and Klies Livestock Company contained the following provision:

"In case of the failure of the second party to fulfill the terms and conditions of this agreement, then in that case the first party may cancel and forfeit this agreement and all of its rights and privileges and may re-enter said premises and the whole thereof and the rights of the second party in said property shall cease. The right of the first party to so cancel and forfeit and re-enter shall become effective upon thirty days notice to second party of the default which may have occurred and of the time and place where the same shall be cured. Said notice shall be complete when mailed to the second party, addressed to it at Browning, Montana."

On November 12, 1956, the defendant Martha Klies mailed to plaintiff at Browning, Montana notice that the contract would be considered cancelled and forfeited unless the balance of $5,894.17 was paid on or before December 14, 1956. On December 10, 1956, plaintiff instituted this action and paid this sum into court.

The defendant Martha Klies contends that the payment into court did not constitute a sufficient tender; that the contract is now cancelled and all rights of plaintiff thereunder forfeited; and that

Martha Klies is entitled to the immediate possession of all of the property covered by the contract.

It does not appear whether any order was entered by the state court for the deposit of the money. In the absence of evidence of any order, it must be assumed that no order was made. Nor does it appear that plaintiff comes within the provisions of Sections 93–2825, Revised Codes of Montana, 1947, or Sections 93–4501 to 93–4504, relating to deposit of money in court. See Doggett v. Johnson, 1928, 82 Mont. 21, 265 P. 673; and Galbreath v. Armstrong, 1948, 121 Mont. 387, 193 P.2d 630. Even though the deposit in court may be legally insufficient as a tender to Martha Klies, however, the plaintiff may be relieved from forfeiture upon a showing of facts sufficient to "appeal to the conscience of a court of equity".

Section 17–102 of the Revised Codes of Montana, 1947, provides:

*"Relief in case of forfeiture.* Whenever, by the terms of an obligation, a party thereto incurs a forfeiture, or a loss in the nature of a forfeiture, by reason of his failure to comply with its provisions, he may be relieved therefrom, upon making full compensation to the other party, except in case of a grossly negligent, wilful, or fraudulent breach of duty."

This section has been construed by the Montana Supreme Court in a number of cases (See Mont.Law Review, Vol. 19, #1, pages 50–55). It has been held that under this statute a person may be relieved "in any case where he sets forth facts which appeal to the conscience of a court of equity." Yellowstone County v. Wight, 1943, 115 Mont. 411, 416, 145 P.2d 516, 517. See Huston v. Vollenweider, 1935, 101 Mont. 156, 53 P.2d 112, and cases there cited.

The section has been applied by the Montana court not only to relieve a defaulting purchaser of a forfeiture of payments under a land purchase contract, but also to allow him a reasonable time after the expiration of the final payment date within which to complete payments and fully perform the contract so as to receive title to the property. Yellowstone County v. Wight, supra. The majority opinion there said:

"Section 8658, Revised Codes (17–102 R.C.M.1947) was enacted for the benefit of obligors whose failure to punctually perform would result in loss to them in the matters in respect to which they have contracted. The intention of the Legislature in enacting the statute was that it should be operative and that it should be given full force and effect when the circumstances in any case gave it application. The intention of the law under this statute is that a forfeiture should not be needlessly enforced. The courts have established that as the policy of the law in absence of statute. The rule as it has found expression in court decisions generally is that both in law and in equity forfeitures are abhorred. Under the circumstances in the instant case, existing at the time of the tender, (at time of trial) we can see no reason why a forfeiture should be declared. (Citing cases.)"

Williams v. Heffner, 1931, 89 Mont. 361, 297 P. 492, 496, was an action in ejectment by vendors of farm lands. The defendant purchaser, who had paid one-half of the purchase price, refused to complete the transaction on the ground that the deed placed in escrow was insufficient in that plaintiffs could not furnish a marketable title and by way of cross-complaint sought recision of the contract. The Supreme Court reversed a judgment in favor of the defendant and remanded to the trial court for a determination of whether defendant should be permitted to rescind or seek an abatement of the purchase price or damages. In that case, the court said:

"The question will naturally arise whether it is now too late for defendant to obtain any relief in case the right of way is held to be an in-

cumbrance, since the time for making final payments under the contract, computed from the time the deed was placed in escrow, has long since passed. We think this case presents facts justifying application of the rule stated in Section 8658, Revised Codes 1921 [quoting what is now Section 17–102, supra].

"We think that, since the questions regarding the title furnished to defendant were fairly debatable, in case it be held upon another trial that the right of way constitutes a breach of the covenant against incumbrances within the rule as we have stated it, defendant should be allowed a reasonable time to tender the balance of the purchase price to plaintiffs, less the difference in the value of the land because of the right of way, if he desires so to do. If he elects not to do so, or if the right of way be held not to constitute a breach of the covenant against incumbrances, then plaintiffs have a right to the possession of the land and to a cancellation of the contract."

In the instant case, the question with respect to the lien asserted by the United States was "fairly debatable". Plaintiff evidenced its good faith by depositing in court the balance due under the contract. Prior thereto it had paid over $29,000 on the purchase price of $35,000. While the procedure followed by plaintiff is not approved, it is my opinion that the case should be considered "upon the broad principles of equity in its general sense." Shearer v. Trumbull, D.C.Wyo.1931, 83 F.Supp. 64, 65. On this basis the de-fendant Martha Klies is not entitled to cancellation and forfeiture of the contract, but is entitled to the deposit of $5,894.17, together with interest thereon at six percent per annum from December 14, 1956.

In summary, my conclusions are:

1. With respect to those lands where the patent did not contain a reservation of a lien for irrigation charges there is no lien and there is nothing due the defendant The United States of America.

2. With respect to those lands where the patent did contain a reservation of a lien, the irrigation charges have been deferred and there is nothing now due the defendant The United States of America.

3. The defendant Martha Klies is entitled to the sum of $5,894.17 on deposit in the registry of this court, together with interest thereon at the rate of six percent per annum from December 14, 1956.

4. Upon payment to the defendant Martha Klies of the sum of $5,894.17, with interest as aforesaid, the defendant Great Falls National Bank is authorized and directed to deliver to plaintiff the deed and bill of sale held in escrow.

The facts herein stated and the conclusions of law herein expressed shall be considered the findings of fact and conclusions of law required by Federal Rules of Civil Procedure, Rule 52, 28 U.S.C.A. The defendant Martha Klies shall within ten (10) days prepare and file a draft of judgment and serve a copy upon each of the other parties. Each other party shall then have ten (10) days within which to serve and file objections to the proposed judgment.